UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARILYN BRYANT, DEANNA NEWTON, ) | |
| and CYNTHIA MEDLEY, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 3:10–cv-922 |
| ) | Judge Trauger |
| ROLLING HILLS HOSPITAL, LLC, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM ON MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF CYNTHIA MEDLEY

The defendant has filed a motion for summary judgment as to plaintiff Cynthia Medley with a supporting memorandum (Docket Nos. 24 and 25), which Medley has opposed in part (Docket No. 32), and the defendant has filed a reply (Docket No. 37).[1]

## BACKGROUND

Rolling Hills Hospital is a private, acute psychiatric facility for adolescent, adult, and geriatric patients run by the defendant, Rolling Hills Hospital, LLC ("Rolling Hills").[2] Plaintiff

---

[1] The defendant also filed separate motions for summary judgment as to plaintiffs Marilyn Bryant (Docket No. 20) and Deanna Newton (Docket No. 27). Bryant, Newton, and Medley filed a consolidated opposition brief (Docket No. 32) and the defendants submitted a consolidated reply thereto (Docket No. 27.) This order addresses the parties' arguments and supporting materials only as they relate to Plaintiff Medley. The facts and arguments concerning claims by Bryant and Newton are addressed in a separate memorandum and order.

[2] Unless otherwise noted, all facts cited herein are drawn from the parties' statements of undisputed facts and associated responses thereto (Docket Nos. 20 and 26), the affidavit of Debbie Kraemer filed by Rolling Hills with attached exhibits (Docket No. 30), the exhibits filed in support of the plaintiffs' Response (Docket No. 36), and the exhibits filed in support of Rolling Hills' Reply (Docket No. 42). The court draws all inferences in favor of the non-moving party. *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348,

1

Cynthia Medley worked for Rolling Hills as a Mental Health Specialist between June 22, 2009 and October 5, 2009, when she was terminated. She claims that Rolling Hills discriminated against her on the basis of race, in violation of 42 U.S.C. § 1981 and the Tennessee Human Rights Act ("THRA").[3]

## BACKGROUND

Rolling Hills hired Medley on June 22, 2009 as a Mental Health Specialist. The hospital has four units: two Adult Units, the Geriatric Unit, and the Adolescent Unit. Although Medley was assigned specifically to the Geriatric Unit, she was trained to work on all units and regularly worked in the Adult Unit once per week.

In September 2009, Medley suffered an unspecified back injury at work. Medley alleges that she provided a doctor's note to Director of Human Resources Elizabeth Starnes, stating that Medley could not perform certain workplace activities due to her injury. Rolling Hills acknowledges that it received a note from Medley's doctor on September 23, 2009, but alleges that the note stated that Medley could return to work without any restrictions. The record before the court does not include this note.

On September 30, 2009, Medley asked Chief Nursing Officer ("CNO") Nancy Reedy, who is Caucasian, if she (Medley) could perform "light duty" work on a unit other than the Geriatric Unit, due to her back injury. CNO Reedy did not grant Medley's transfer request.

---

89 L. Ed. 2d 538 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

[3]Medley also pled claims for hostile work environment and retaliation in the Amended Complaint (Docket No. 8). Medley states that she "voluntarily dismisses and/or abandons her hostile work environment claims." (Docket No. 32 at FN 1.) Also, she has not opposed summary judgment on her retaliation claims and states only that she "maintains claims for discrimination," which the court construes as an abandonment of the retaliation claims.

2

Medley admits that the refusal to transfer her did not affect her pay, benefits, or employment status. Medley alleges that she also asked supervisor Elaine Ballard if she could "pick up some hours" and that Ballard told her, "I don't see why not," or something to that effect. Medley then manually altered the work schedule to shift herself out of the Geriatric Unit on that day. As a matter of company policy, Rolling Hills establishes a schedule to ensure proper coverage for its various units and does not permit its employees to unilaterally change that schedule.[4] Accordingly, Medley's supervisor, Angela Klinikowski, immediately counseled Medley for altering the schedule without permission. Klinikowski then contacted the Human Resources Department, which allegedly informed Klinikowski that Medley had no workplace medical

---

[4]Medley makes two allegations concerning Rolling Hills' scheduling policy that are unsupported by the record. First, Medley alleges that, in practice, Rolling Hills permitted employees to alter the work schedule unilaterally, stating that "I wasn't the only one, now, because I saw everybody – some nurses was doing it and some other, you know, technicians was doing it, and they initial their name [sic] on there." (*See* Docket No. 36, Ex. 5 ("Medley Dep.") at 47:13-16.) However, Medley has not identified these employees or the specific alleged instances of schedule alterations. Furthermore, Medley has not produced record evidence that Rolling Hills was aware of these alleged schedule alterations, that the alterations were made without approval, or that Rolling Hills did not discipline these unidentified employees for altering the schedule. Second, in her response to Rolling Hills' statement of undisputed facts, Medley cites to her deposition for the proposition that two Caucasian employees named "Melody" and "Anne" had previously altered the work schedule without being disciplined. (Docket No. 39.) However, the cited testimony concerns Medley's allegation that Melody and Anne received requested transfers, not whether these two employees had manually altered the schedule at any point. Thus, the record contains no evidence tending to refute Rolling Hills' contention that it did not permit employees to make changes to the hospital staffing schedule without prior approval. Medley's unsupported speculation is insufficient to create a genuine dispute of fact on this point.

Furthermore, as to Melody and Anne, Medley alleges that these employees were granted transfers from the Geriatric Unit to other units, apparently in an effort to demonstrate that Rolling Hills was discriminating based on race by not transferring Medley. However, Medley admitted that Melody was transferred because she lacked a required professional qualification and Medley provided no details provided no details concerning when Anne allegedly received a transfer or what the circumstances of that transfer were.

restrictions. Klinikowski then issued a second counseling to Medley, citing her for dishonesty and insubordination for misrepresenting that she had a medical condition that affected her unit assignment. Medley does not believe that this second counseling was racially motivated.

Later that same night, several events occurred that led to Medley's termination. Rolling Hills requires employees to comply with a "Levels of Observation Policy," which outlines various levels of patient monitoring, pursuant to physician's orders, designed to ensure the safety and security of both patients and staff. The highest level of observation is known as a One-to-One Observation ("1:1"), in which a specific staff member must stay within approximately one arm's length of a designated patient at all times. Patients placed on a 1:1 observation are generally those who pose a high risk of harm to themselves or others. No staff member may decrease the level of observation without a physician's order.

Medley was assigned to a 1:1 patient in the Geriatric Unit. Medley asked another nurse, identified only as "Mary," to cover the 1:1 patient while Medley took a break to go to the bathroom. While Medley was gone, Mary left the 1:1 patient unattended to assist another nurse with an emergent situation involving a geriatric patient who had just suffered a serious fall. When Medley returned from the break and found that her 1:1 patient was unattended, she asked the nurse on duty what had happened. Mental Health Specialist Jessica Villar, who is Caucasian, joined the conversation. Villar and Medley then had a verbal altercation, in which Villar at some point told Medley that "we can take this outside," or words to that effect. Medley's supervisor contacted CNO Reedy and an African-American supervisor, Daisy Broughton, to assist. Reedy and Broughton then excused both Medley and Villar from the remainder of their respective shifts and sent them home.

The next day, Rolling Hills investigated the previous night's events. Rolling Hills solicited and received statements from several employees who witnessed the altercation, as well as from Villar, but Rolling Hills did not solicit or receive a statement from Medley. The witnesses claimed that Medley had initiated the altercation. Rolling Hills also reviewed video footage of Medley's handling of the 1:1 patient, although Rolling Hills did not retain a copy of the video.[5] Rolling Hills Director of Performance Improvement and Risk Management, Susan Nance, reviewed the video on October 1, 2011 and, in an email to Klinowski, wrote that the video reflected that, during her shift, Medley turned her back on the 1:1 patient several times, read magazines, worked on her checkbook, went to another patient's room, talked on her cell phone, and left her purse unattended.

On October 5, 2011, Rolling Hills discharged Medley. The Corrective Active Form reflecting Medley's termination indicates that Medley was disciplined for "Arguing" and "Safety Concerns," in violation of the company's Professional Ethics Rules, Anti-Harassment Rules, and Levels of Observations Policy. The form contains a description of the night's events, including both the altercation and Medley's alleged failure to adhere to company policies with respect to her 1:1 patient. At deposition, Medley acknowledged that Rolling Hills had provided her with a copy of the form and that, at the time, Klinikowski had told her the video showed her not paying attention to the 1:1 patient. Nevertheless, Medley believes that she was terminated only for "arguing" with Villar, not for any of the safety concerns identified by Rolling Hills related to her

---

[5]Rolling Hills testified that, in the ordinary course of business, its servers only retained unit videos for six months. Accordingly, it would have deleted the video in approximately April 2010. Medley did not make Rolling Hills aware of any racial discrimination claim before she filed the instant lawsuit in October 2010.

treatment of the 1:1 patient.[6]

At deposition, Medley acknowledged that, during her 1:1 assignment on September 30, 2010, she did not always stay within one arm's length of the patient, she spoke on her cell phone, and she "probably" had read a magazine outside the patient's door. However, she denied working on her checkbook in the patient's room, alleging that she would have conducted that activity in the break room.

In contrast to its treatment of Medley, Rolling Hills did not terminate Villar following the September 30, 2009 incident. Villar received a counseling on October 1, 2010 (the day after the incident), which cited her for "Fighting/Arguing" and "Safety Concerns," in violation of the company's Professional Ethics code. The written counseling described the fact of Villar's altercation with Medley and stated that the incident was unprofessional and caused a safety concern. Villar was permitted to return to work the next day. Medley admits that Villar was not assigned a 1:1 patient on the night of their altercation.

## **ANALYSIS**[7]

---

[6] In the undisputed statement of material facts, Medley points out that the Corrective Action Form does not contain a signature block bearing her signature. (Docket No. 39 ¶ 14.) However, at deposition, Medley acknowledged that she received a copy of it. (See Docket No. 36, Ex. 5 at 62:10-14.)

[7] Claims under § 1981 are analyzed under the same standards as those utilized for a Title VII claim, *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999), as are claims under the THRA. Although the Tennessee Supreme Court, in *Gossett v. Tractor Supply Co.*, 320 S.W. 3d 777 (Tenn. 2010), had rejected application of *McDonnell-Douglas* to THRA claims as inconsistent with the Tennessee standard for summary judgment, *Gossett* was abrogated by statute in favor of the *McDonnell-Douglas* burden-shifting framework for all claims filed after June 10, 2010. *See* Tenn. Code Ann. 4-21-311 (2011). Medley's claims were filed on October 4, 2010. Regardless, courts have found that *Gossett* articulated a procedural rule that is not binding in federal court. *See, e.g., Reed v. Inland Intermodal Logistics Servs., Inc.*, No. 09-2607, 2011 WL 4565450, *5-*7 (W.D. Tenn. Sept. 29, 2011) (applying *McDonnell-Douglas* framework to THRA claims); *Moling v. O'Reilly Auto., Inc.*, 763 F. Supp. 2d 956 (W.D. Tenn. 2011) (same).

## I. Summary Judgment Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## II. Disparate Treatment Standard

Medley argues that circumstantial evidence supports her claims of disparate treatment. Under the circumstantial evidence approach, the familiar *McDonnell Douglas* burden-shifting

---

Indeed, here, both parties agree that the *McDonnell-Douglas* framework applies to Medley's THRA claims. Thus, the court need only a conduct a single analysis of Medley's claims under the standards applicable to a Title VII claim.

framework is employed. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007). First, the plaintiff must produce evidence to establish a *prima facie* case of racial discrimination. *Caterpillar*, 496 F.3d at 593. To do this, the plaintiff must demonstrate that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside of the protected class or was treated differently from similarly situated members of the unprotected class. *Id*.

If the plaintiff establishes her *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the for the employment decision." *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007); *Carter v. Univ. of Toledo*, 349 F.3d 269, 273-74 (6th Cir. 2003). To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision. *Clay*, 501 F.3d at 703-704.

Finally, if the defendant meets its burden of articulation, "the burden shifts back to the plaintiff to show that the reason put forth by the defendant is pretextual, which can be done by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* at 704; *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). To make this showing, "the plaintiff must allege more than a dispute over the facts on which [her] discharge was based. [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). In order to determine whether the defendant had an "honest belief" in the proffered basis for the adverse employment

8

action, the court must look to whether the employer can establish a reasonable reliance on the particularized facts that were before it at the time the decision was made. *Id.* at 494. The court must apply the following standard:

> In deciding whether an employer reasonably relied on the particularized facts then before it, *we do not require that the decisional process used by the employer be optimal or that it left no stone unturned*. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

*Id.* (quoting *Smyth v. Chyrsler*, 155 F.3d 799, 806-07 (6th Cir. 1998)) (emphasis added); *Majewski v. Auto. Data Processing*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("As long as an employer has an honest belief in its proffered nondiscriminatory reason for [the adverse employment action], the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect").

In conducting this analysis, "[c]ourts are not intended to act as 'super personnel departments' to second guess an employer's facially legitimate business decisions." *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 Fed. App'x 266, 272 (6th Cir. 2006). Thus, "the pivotal issue in . . . claims of discriminatory employment practices is whether 'the employer treated some people less favorably than others because of their race,' not whether the employer treated an employee less favorably than 'someone's general standard of equitable treatment.'" *Id.* (quoting *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 2006)).

### III. **Application**

Medley alleges that Rolling Hills discriminated against her with respect to her termination. Rolling Hills contends that Medley has not met her *prima facie* burden and that, even if she met this burden, she cannot show that Rolling Hills' decision to terminate her was a

9

pretext for racial discrimination.[8]

   (1)  Comparator Analysis

  To make out her *prima facie* case, Medley must show that a comparable non-protected person was treated better than she was for engaging in the same conduct. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). To make this showing, Medley must produce evidence which at a minimum establishes that, for the same or similar conduct, she was treated differently than similarly situated non-minority employees. *Id.* The Sixth Circuit has articulated

---

[8]Rolling Hills does not dispute that Medley is a member of a protected class who was qualified for her position; nor does it dispute that Medley's termination constituted an "adverse action." Also, although the "adverse action" section of Medley's Response references only her termination, Medley also suggests in other portions of her Response that the written counseling for altering the schedule and the denial of a transfer to another unit reflected "disparate treatment." (*See* Response at p. 14.) The court notes that these actions would not constitute "adverse actions" in any case, because they did not affect Medley's title, pay, or benefits. *See Hill v. Nicholson*, 383 Fed. App'x 503, 509 (6th Cir. 2010) (written counseling not actionable); *Norman v. Rolling Hills Hosp.*, No. 3:10-cv-0500, 2011 WL 1877651, at *5 (M.D. Tenn. May 17, 2011) (same); *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885-86 (6th Cir. 2000) (purely lateral transfer or denial of a lateral transfer not actionable). Furthermore, notwithstanding her generalized speculation to the contrary, Medley has not identified a similarly situated Caucasian comparator who was granted a transfer under "nearly identical" circumstances, nor has she provided any non-speculative evidence that Caucasian employees were routinely permitted to alter the staffing schedule without permission and without consequence. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Finally, Medley cannot demonstrate pretext for these actions. Rolling Hills alleges that it assigned employees to different units based on hospital staffing needs and that it did not permit employees to unilaterally alter its schedule as a matter of policy, thereby meeting its burden of articulation. Notwithstanding the factual dispute concerning the substance of the doctor's note and whether Medley actually received approval to alter the schedule, Medley admits that the counseling for allegedly seeking a transfer under false pretenses was not racially motivated. Also, Medley's *ipse dixit* belief that Rolling Hills denied her a transfer as part of an effort to keep her and other African-American employees in the Geriatric Unit is insufficient to rebut Rolling Hills' asserted non-discriminatory basis for its scheduling assignments. *Adams,* 179 Fed. App'x at 272 (upholding district court grant of summary judgment where plaintiff "baldly assert[ed]" that employer's proffered reasons for termination were pretextual by reference only to the plaintiff's self-serving deposition testimony, affidavits, and emails). For these same reasons, neither do Medley's speculations provide circumstantial evidence of discriminatory intent by Rolling Hills.

the standard for this analysis as follows:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated *in all respects*. Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.

*Id.* at 583 (emphasis in original) (internal citations omitted) (holding that the plaintiff had not provided sufficient facts concerning alleged comparators to demonstrate that they were similarly situated); *accord Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002). Thus, a plaintiff is "required to prove that all of the relevant aspects of [her] employment situation were *nearly identical* to those of the [comparator's]." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted) (emphasis added). Accordingly, in the disciplinary context, the plaintiff and the comparator must have engaged in acts of "comparable seriousness." *Clayton* 281 F.3d at 611 (finding that truck drivers who, like plaintiff, had also pulled a rig away from the loading dock without insuring that back doors were closed were not "similarly situated" to the plaintiff, where resulting harm differed).

Medley compares herself to Villar, the Caucasian Mental Health Specialist with whom Medley had a verbal altercation. The record reflects that, just days after the incident, Medley received a disciplinary report indicating that she was terminated both for engaging in the altercation *and* for independently violating the 1:1 patient observation requirements. Medley concedes that she engaged in at least some of the offending actions concerning her 1:1 patient, which facially violated hospital policies designed to ensure the safety and security of patients and staff. (*See* Docket No. 36, Ex. 6 at pp. 3-4 (1:1 patient observation policy).) Medley also

11

concedes that Villar was not assigned a 1:1 patient that evening and, therefore, Villar could not have engaged in these same safety violations. Thus, although both Medley and Villar both engaged in a verbal altercation, Medley also violated the hospital's 1:1 observation policy while Villar did not. Thus, as to the conduct underlying Rolling Hills' differing disciplinary actions, Medley and Villar did not engage in "nearly identical" conduct or in acts of comparable seriousness. *See Clayton* 281 F.3d at 611 ("The employer's more severe treatment of more egregious circumstances cannot give rise to an inference of discrimination."); *Ercegovich*, 154 F.3d at 352. Thus, Medley has failed to identify a non-minority comparator who was similarly situated in all relevant respects and, therefore, she has failed to make out her *prima facie* case.

    C.    <u>Legitimate Non-Discriminatory Reason/Pretext</u>

Even assuming *arguendo* that Medley met her *prima facie* burden, summary judgment would be appropriate because she has failed to demonstrate pretext.

Rolling Hills contends that it terminated Medley because, in addition to the verbal altercation, Medley violated various hospital safety polices related to her 1:1 patient during her shift that night. Thus, Rolling Hills has met its burden to articulate a legitimate, non-discriminatory reason for Medley's discharge.

In response, Medley argues that race played a motivating factor in the decision to terminate her. She contends that the jury could draw a negative inference from the fact that Rolling Hills did not retain a copy of the videotape of her treatment of the 1:1 patient and that Rolling Hills did not solicit a statement from her in its investigation. Medley also contends that Rolling Hills has only now, in the context of this litigation, alleged that it discharged Medley because of her conduct relative to the 1:1 patient. Essentially, Medley argues that Rolling Hills

12

engaged in a "cover-up" for which it is only now providing facially reasonable *ex post facto* justifications.

Medley's arguments concerning pretext are not supported by the record. As an initial matter, the record contains ample evidence that Rolling Hills contemporaneously identified serious concerns with Medley's treatment of the 1:1 patient and communicated those concerns to Medley verbally and in writing. (*See, e.g.*, Docket No. 38, Ex. 8 at Ex. 17 (October 1, 2010 email from Nance to Klinikowski regarding 1:1 patient observation policy violations viewed on unit video recording); Medley Dep., Ex. 10 (October 5, 2010 corrective action form identifying violations of company policy with respect to 1:1 patient); Medley Dep. at 62:10-14 (acknowledging receipt of October 5, 2010 corrective action form) and 70:16-22 (discussing argument with Klinikowski over substance of unit video and whether it showed Medley "not paying attention to my one-on-one")). Thus, it is plain that Rolling Hills raised its facially legitimate concerns about Medley's conduct with respect to the 1:1 patient at the time, not just in the context of this litigation.

As to Rolling Hills' investigation concerning the incident, Rolling Hills immediately conducted unit video analysis and solicited statements from witnesses. The fact that this investigation may not have left "no stone unturned" or may not have been optimal is insufficient, standing alone, to support a finding of pretext. *See Braithwaite*, 258 F.3d at 496-97 (upholding district court grant of summary judgment where employer had solicited and received statements from various witnesses but not plaintiff). As to retention of the video, it appears that Rolling Hills discarded the video as a matter of course six months after the footage was taken, well before Medley made Rolling Hills aware of her belief that her termination was racially

13

motivated. Regardless, even if Rolling Hills should have retained the video, Medley admitted that she engaged in at least some of the offending conduct allegedly captured on it. Thus, even without relying on the video, the record contains uncontradicted testimony from Medley that supports Rolling Hills' facially reasonable justification for her termination.

All that remains is Medley's self-serving *ipse dixit* belief that Rolling Hills' stated reasons were pretextual, which is insufficient to meet her burden. *See Adams*, 179 Fed App'x at 274 (upholding district court grant of summary judgment where, by reference only to the plaintiff's self-serving deposition testimony and affidavits, the plaintiff "baldly assert[ed]" that the employer's proffered reasons for termination were pretextual); *see also Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (stating that "mere personal beliefs, conjecture and speculation are insufficient" to support an inference of pretext). Accordingly, even assuming that Medley satisfied her *prima facie* burden concerning her termination, Medley has not adduced sufficient evidence to demonstrate that race played a motivating factor in her termination, rather than legitimate business concerns.

## CONCLUSION

For the reasons stated herein, Rolling Hills' motion for summary judgment on all claims by Medley will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge