**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **MARILYN BRYANT, DEANNA NEWTON,** ) | |
| **and CYNTHIA MEDLEY,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 3:10–cv–00922** |
| ) | **Judge Trauger** |
| **ROLLING HILLS HOSPITAL, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM CONCERNING MOTION FOR SUMMARY JUDGMENT**
**AS TO PLAINTIFFS MARILYN BRYANT AND DEANNA NEWTON**

The defendant has submitted motions for summary judgment with supporting memoranda

as to plaintiffs Marilyn Bryant (Docket Nos. 20 and 21) and Deanna Newton (Docket Nos. 27

and 28), to which the plaintiffs filed a consolidated opposition (Docket No. 32), and in support of

which the defendant filed a consolidated reply (Docket No. 37).[1]

**BACKGROUND**

Rolling Hills Hospital is a private, acute psychiatric facility for adolescent, adult, and

geriatric patients.[2]  Plaintiffs Bryant and Newton ("Plaintiffs") formerly worked at the hospital as

---

[1]The defendant also filed a motion for summary judgment on all claims by the remaining
plaintiff, Cynthia Medley.  (Docket No. 24.)  Bryant, Newton, and Medley filed a consolidated
opposition brief (Docket No. 32), and the defendant submitted a consolidated reply thereto
(Docket No. 37.)  This order addresses the parties' arguments and supporting materials only as
they relate to plaintiffs Bryant and Newton.  By order entered December 15, 2011, all claims
asserted by plaintiff Medley were dismissed.  (Docket No. 46.)

[2]Unless otherwise noted, all facts cited herein are drawn from the parties' statements of
undisputed facts and the responses thereto (Docket Nos. 22, 26, 29), the declaration of Debbie
Kraemer and attached exhibits filed by the defendant (Docket No. 30), the exhibits attached to the
defendant's motions (Docket Nos. 20 and 27), the exhibits filed by the parties under separate

employees of the defendant, Rolling Hills Hospital, LLC ("Rolling Hills"). The Plaintiffs were

both hired by Rolling Hills in June 2009 and both ceased working at Rolling Hills in September

2010. The Plaintiffs contend that Rolling Hills discriminated against them on the basis of race

and retaliated against them for complaining about perceived racial discrimination, in violation of

Title VII, 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA").[3]

## I.    Marilyn Bryant

On June 8, 2009, Rolling Hills hired Bryant as a full-time Registered Nurse. In mid-

November 2010, Bryant suffered a knee injury at the workplace that required surgery. She asked

for and received a personal medical leave of absence beginning November 17, 2009. She did not

return to work until February 10, 2010.

At an unspecified point before January 13, 2010 – presumably no later than November

17, 2009, when Bryant took her leave – Bryant alleges that three Caucasian co-workers on one of

her shifts, including a nurse named Cherie Irwin, refused to permit Bryant to participate in

deciding which nurse would lead their shift. Bryant became upset because these co-workers, in

her opinion, had exhibited a history of insubordination to supervision by African-Americans.

After Bryant complained, Irwin reported Bryant to Chief Nursing Officer ("CNO") Nancy Reedy,

who convened a meeting with Bryant. In that meeting, Reedy questioned Bryant about why

cover (Docket Nos. 36 and 42), and the complete copies of certain deposition transcripts and
associated exhibits filed per court order (Docket No. 44). The court draws all inferences in favor
of the non-moving party. *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th
Cir. 2009).

[3]The Plaintiffs also pled hostile work environment claims under Title VII, § 1981, and the
THRA in the Amended Complaint. (Docket No. 8.) However, in response to the motions for
summary judgment, they have voluntarily dismissed and/or abandoned these claims. (Docket
No. 32 at FN 1.)

Bryant was not acting as a "team player." Bryant alleges that she complained to Reedy that her white co-workers did not want her (Bryant) in charge because she was African-American. Although Rolling Hills disputes that Bryant expressed any concerns about racial discrimination during this meeting, the record contains no testimony from Reedy.

In December 2009, while she was on leave, Bryant testified before a Tennessee Human Rights Commission ("THRC") investigator concerning a charge of racial discrimination filed against Rolling Hills by Angela Norman, an African-American co-worker. Although the THRC charge filed by Norman apparently contained a page listing Bryant as a witness, Rolling Hills did not receive notice from the THRC that Bryant was participating in the THRC investigation,[4] nor

---

[4]Although Bryant contends that Rolling Hills was aware that Bryant was listed as a witness on Norman's behalf, the record does not support this contention. In the matter of *Norman v. Rolling Hills Hosp.*, No. 3:10-cv-500 (M.D. Tenn. filed May 21, 2010), Rolling Hills produced a copy of the charge it received from the THRC concerning Norman. (Docket No. 44, Attachment ("Attach.") 2 at Ex. 16.) That copy is signed by Norman and contains the official intake stamp of the THRC. Consistent with THRC policy, the document contains no list of witnesses and includes no references to Bryant. *See* Tenn. Comp. R. & Regs. 1500-01-01-.02(a) ("The identity of individuals interviewed as witnesses shall remain confidential except when the disclosure of their identity becomes necessary at the time of public hearing.") & 1500-01-01-.02(b) ("Where . . . information concerning persons other than the complainant is relevant to the issues raised in the charge, names and other identifying information shall be redacted before disclosure in order to protect the persons' privacy.") In support of her contention that Rolling Hills nevertheless was aware of her participation in the THRC investigation, Bryant cites to a document produced by counsel for Norman (who also serves as counsel for Bryant here) at the deposition of a Rolling Hills witness, Justin Adams, on February 22, 2011. (Docket No. 46, Attachment 4 at Ex. 12.) This document is an unsigned copy of Norman's THRC charge that does not bear the THRC intake stamp. At the deposition, Norman's counsel had produced a December 7, 2009 letter from the THRC to Starnes at Rolling Hills that had originally enclosed Norman's THRC charge, but the letter produced by Norman's counsel did not include any of the attachments. Counsel then showed Adams the unsigned version of the THRC complaint that included a witness page identifying Bryant as a witness. Norman's counsel represented that it was the attachment to the December 7, 2009 letter to Starnes, and counsel for Rolling Hills did not object. After reviewing these materials closely, the court is not persuaded that the THRC violated its own requirements by allegedly disclosing Bryant's identity to Rolling Hills in December 2009. Thus, Bryant has not demonstrated that there is a genuine dispute of fact on

did Bryant independently make Rolling Hills aware of her involvement.

Later in December 2009, after testifying before the THRC, Bryant called Rolling Hills' corporate office to complain about racial discrimination against her. Bryant spoke with an individual named "Elizabeth," who told her that Rolling Hills did not handle complaints of this nature at a corporate level and that she needed to speak with someone in human resources at the facility where she worked. Bryant did not contact anyone in the HR department at the Rolling Hills Hospital at that time.

On February 10, 2010, Bryant returned to work. At her request, she returned as a practicing registered nurse ("PRN"), rather than as a full-time nurse. Unlike full-time nurses, a PRN is not guaranteed a minimum number of hours per week.

On February 15, 2010, Bryant called in seeking to be excused from her shift because of inclement weather, fearing that she might re-injure her knee if she attempted to travel to work with "ice on the ground." (Docket No. 36, Attach. 1, Bryant Deposition ("Bryant Dep."), at 106:6-12.) Rolling Hills has an inclement weather policy, which requires that employees report to work even in inclement weather to ensure proper staffing for its various units. After Bryant sought to be excused from work, then-CNO Angela Klinikowski, one of Bryant's supervisors, immediately issued a written counseling to Bryant, citing her for violating the inclement weather policy. The write-up made no mention that Bryant had called in to report her absence, nor did it mention the basis for which Bryant had sought to be excused. Bryant did not receive any demotion, suspension, or loss in pay from this write-up, although the counseling notes that "any further infractions may result in progressive disciplinary action to include termination." (Docket

this point.

4

No. 36, Attach. 8 at Ex. 5.)  Rolling Hills testified that it has no record that any other employee violated or was written up for violating the inclement weather policy.

On an unspecified date in February 2010, Klinikowski also loudly reprimanded Bryant in front of her co-workers.  Bryant was dealing with a psychotic patient who had struck an employee.  In an apparent attempt to control the patient, Bryant issued a pointed verbal command to the patient to "stop."  Klinikowski then loudly reprimanded Bryant in front of her co-workers, stating that Bryant should not have yelled at the patient.  Bryant believed the verbal reprimand to be unjustified and had never heard Klinikowski issue a reprimand to a Caucasian nurse, including Irwin, under similar circumstances.  Bryant then consulted with her training instructor, who assured her that she appropriately had dealt with the patient as she had been trained to do.

Bryant worked eighteen shifts between February 10, 2010 and April 20, 2010, after which Rolling Hills did not schedule her to work any shifts until July 7, 2010, a span of approximately ten weeks.  Bryant made multiple calls to two of her supervisors, seeking to determine why her shifts had been eliminated and to express that she was "ready, willing, and able" to work. (Bryant Dep. at 71:8-13.)  These supervisors did not return her calls.  The hospital continued to operate during this time period, and there is no evidence in the record that any other PRNs had their hours similarly reduced to zero.  During this time, Klinikowski approved the daily staffing schedules.  On April 26, 2010, Bryant took a position at another psychiatric hospital, Skyline Madison ("Skyline"), because she "needed a job."  (*Id.* at 127:5-7.)

In May 2010, Rolling Hills replaced its CEO, who conducted a review of all senior management and determined that Klinikowski "wasn't meeting his requirements . . . for the CNO position."  (Docket No. 36, Attach. 7, Deposition of Rolling Hills ("Rolling Hills Dep."), at 9:6-

18.)  In late June 2010, Rolling Hills offered Klinikowski the opportunity to resign voluntarily, which Klinikowski did.  Reedy assumed Klinikowski's position.

At deposition, Rolling Hills offered only one explanation for not scheduling Bryant for ten weeks – namely, that Rolling Hills was in "the middle of a major transition at the hospital of the CEO and the CNO."  (Rolling Hills Dep. at 71:15-16.)  It alleges that, as a result of this transition, "there was [no] availability provided . . . during that transition of Tom [the outgoing CEO] leaving and Rick [the incoming CEO] coming on and Angela [Klinikowski] leaving."  (Rolling Hills Dep. at 71:23-72:2.)  The hospital did continue to operate during this time frame.

 In July 2011, shortly after Klinikowski resigned, Reedy called Bryant to inform her that it "was a new day" at Rolling Hills and asked Bryant to return to work.  (Bryant Dep. at 139:20-140:4.) Bryant began working at Rolling Hills again in July or August 2010.

In August 2010, after returning to work, Bryant reported to Reedy that she had heard a co-worker make offensive racial comments on two occasions.  Bryant reported that the co-worker had referred to her as "Buckwheat" one year earlier.  Bryant alleges that she also told Reedy that the same co-worker had recently made a joke about what might happen if he met a particular African-American colleague in a dark alley, which Bryant believed was racially offensive.  Reedy agreed to investigate Bryant's allegations.  The record contains no information regarding whether Reedy in fact investigated Bryant's claims.

On September 13, 2010, Bryant reported to work and found that she was scheduled to work in the Geriatric Unit.  The circumstances of what transpired next are highly disputed.  Bryant claims that she informed her supervisor that, due to her knee injury, she could not handle working that shift in the Geriatric Unit, which she believed involved more demanding physical

work than other units. Bryant contends that her house supervisor, Megan Williams, then gave her permission to clock out and leave. By contrast, Rolling Hills contends that Bryant simply stated that she would not work in the Geriatric Unit, without any reference to her knee condition. Rolling Hills alleges that Williams then asked Bryant to wait so that she could speak to her about this issue, after which Bryant left without waiting to speak with Williams. Bryant admits that she had not received any written restrictions from her physician that prohibited her from working on the Geriatric Unit at that time.

Bryant contends that she was removed from the staffing schedule following the September 13 incident. Rolling Hills disputes this contention, citing to its daily staffing schedule for the month of September, which listed Bryant for shifts on September 15, 17, 22, and 23. (*See* Docket No. 36, Attach. 8 at Ex. 7.) Notwithstanding this document, Bryant apparently believed that she had been removed from the schedule and attempted to contact Rolling Hills several times to determine why. On September 15, 2010, Bryant emailed supervisor Elaine Ballard, stating that she had called Ballard but received no answer and that she (Bryant) was off the schedule for the following week and did not know why. Ballard did not email her back. Bryant also alleges that she called supervisor Wilson, who advised her that Reedy would decide whether Bryant could return to work and that Reedy would be on vacation until the following Monday, September 20.

The September 17 Daily Staffing Schedule contains a handwritten notation that "Marilyn quit." Bryant denies that she ever quit. Bryant alleges that, as Wilson had suggested, she left a voicemail with Reedy on September 20 asking why she had been taken off the schedule. Reedy did not call her back.

Bryant did not report for work on September 15, 17, 22, and 23, the dates on which Rolling Hills claims she was still scheduled for shifts. On September 23, Administrative Coordinator Courtney Dusek, who handled scheduling, sent an email to all employees requesting that they submit availability for October if they had not done so already. Bryant had not yet submitted October availability and did not respond to that email.[5] The September 30 shift schedule contains a handwritten notation that Bryant and her colleague (and now co-plaintiff) Newton were "not to work anymore." (*See* Docket No. 36, Attach. 8 at Ex. 7.)

Rolling Hills alleges that Bryant quit on September 17, based on the notation that "Marilyn quit." However, it also contends that Bryant never formally quit her employment and, therefore, remains listed a Rolling Hills employee, even though Bryant never worked any shifts after September 13, 2010. Rolling Hills contends that the statement that Bryant was "not to work any more" merely reflected an understanding that Marilyn had not submitted her October availability, not that Rolling Hills had decided to terminate her or to refuse to schedule her for any more shifts.

At deposition, the Rolling Hills corporate deponent initially expressed her belief that Ballard had written the September 17 "Marilyn quit" note and that Dusek had written the September 30 note that Bryant and Newton were "not to work anymore." However, upon further questioning, the deponent admitted that she did not know who had written the notes (Rolling Hills Dep. at 119:17-120:1) and, in any case, had not spoken to Ballard or Dusek in preparing for the deposition. There is no testimony in the record from Ballard or Dusek.

_____

[5]Bryant purports to dispute Rolling Hills' assertion that she did not contact Dusek, but Bryant does not cite to any record evidence that she in fact responded. (Docket No. 33, Response to ¶ 13.)

Rolling Hills also testified that it conducts an administrative review of its PRNs each October and that inactive nurses admittedly "fall off the rolls" at that time. (Rolling Hills Dep. at 98:21-25.) Notwithstanding this alleged review process, Rolling Hills did not administratively terminate Bryant in October 2010 or October 2011.

## II.    Cynthia Newton

Rolling Hills hired Newton as a PRN in June 2009. As of 2010, Newton had been practicing as a nurse for 26 years. Newton generally worked four to five days per week. Newton was not qualified for the Adolescent Unit and worked primarily on the Adult I Unit, which she believed was "more stressful" than other units. Newton's supervisor, Wilson, declined to grant her request for a permanent transfer to the Adult II Unit, informing her that her experience and skill was needed in the Adult I Unit.[6] Newton alleges that Rolling Hills granted transfer requests to certain Caucasian nurses, although she did not identify when and why those transfers allegedly were made.

On February 17, 2010, while Newton was in charge of the Adult I Unit, a Mental Health Specialist found a wire-bound notebook in a psychiatric patient's possession. It was against Rolling Hills policy for patients to have wire-bound notebooks. Newton confiscated the notebook and asked a white nurse, a female identified only as "Kyle," to await word from management about how to proceed. For reasons not contained in the record, Newton then strongly reprimanded Kyle for speaking harshly to a patient. Kyle immediately complained to

---

[6]According to Newton, Wilson told her, "I like you on this unit, being adult one. I like how strong you are. You know, you're able to give direction. You've got a lot of experience. You're able to carry this unit and control it throughout the shift. I'm confident in your ability to work this unit." (Docket No. 36, Attach. 3, Deposition of Newton ("Newton Dep."), at 74:11-16.)

management about the reprimand and apparently alleged that Newton had allowed the wire-bound notebook to enter the unit. Without conducting any investigation, Klinikowski took Kyle at her word and drafted a written counseling, which cited Newton for allowing the notebook in the unit, for speaking harshly to a staff member (presumably Kyle), and for refusing to take a report on a patient. In fact, the lead nurse on a previous shift had allowed the patient to have the wire-bound notebook, without Newton's knowledge. Thus, Newton was in fact without fault.

On March 4, 2010, several weeks after the incident, Wilson delivered the counseling to Newton, said that he did not agree with it, and told Newton that Klinikowski had asked him to wait until March 4 to issue it. Newton refused to sign the write-up, which she believed was unjustified. She did not receive any suspension, demotion, or loss in pay as a result of the counseling.

In March 2010, after receiving the counseling, Newton spoke with Director of Human Resources Elizabeth Starnes to express her complaints. During that discussion, Newton complained that the underlying allegations were unfounded and that the counseling reflected "discrimination," believing that Rolling Hills had unfairly assumed the claims were true because a white employee submitted them.[7] Upon receiving this complaint, Starnes informed Newton

---

[7]Rolling Hills contends in its briefing that, according to her testimony, Newton did not complain to Starnes that the perceived "discrimination" was based on Newton's race. (Docket No. 28 at pp. 6-7). The court has examined the referenced testimony by Newton. Taken in context, it is plain that, by using the term "discrimination" in her description of the discussion with Starnes, Newton was referring to racial discrimination. (Newton Dep. at 81:20-25 ("I told [Starnes] . . . that I felt harassed and that I felt that it was discrimination. I was totally humiliated because, there again, a white co-worker, counterpart, was able to go to management, complain of an alleged incident, her word [was] taken, and there was no investigation. . . .").)

Rolling Hills also contends that, notwithstanding the above-referenced testimony, Newton admitted at deposition that she never brought any claims about racial prejudice to

that she would investigate Newton's claims, apologized for "undue processes" (Newton Dep. at 82:15), and requested the names of those involved. After Starnes investigated Newton's claims about the counseling, she determined that the counseling was improperly issued, apologized to Newton for it, and told Newton she would remove it from her personnel file. However, it appears that Rolling Hills did not remove the written counseling from Newton's file as Starnes had promised.[8]

On August 13, 2010, Dusek made a notation in Rolling Hills' Time Card System regarding Newton. Although the record regarding the function and use of this system is not a model of clarity, it appears that the Time Card System was used to measure the time when an employee punched in and punched out of work. Towards the end of the printout relating to Newton's time are a series of "supervisor edits" that reflect manual changes to the timekeeping system for payroll purposes. The meaning of the last two supervisor edits are the subject of vigorous dispute between the parties here. The entries read as follows: "CDUSEK 08/13/10 11:30a DEL SCH ON 09/27/10;" "CDUSEK 08/13/10 11:30a DEL SCH ON 10/01/10." At

management. It cites to a portion of the deposition in which, in the context of discussing Newton's THRC charge, the following question and answer took place: "Q:     Did you file a charge of discrimination against Rolling Hills?  A:  I did.  Q:  While you were at Rolling Hills, did you ever talk to anyone in human resources or in management about your concerns for being mistreated based on your race?  A: I did not."  (Newton Dep. at 109:12-21.)  The court is surprised that counsel for Newton did not object to this question, which did not acknowledge Newton's earlier deposition testimony that she had expressed concerns about racial prejudice to Starnes in March 2010.  Accordingly, the court will treat Newton's specific testimony concerning her March 2010 discussion with Starnes as trumping her answer to the subsequent objectionable general question posed by counsel for Rolling Hills.

[8]Rolling Hills purports to dispute whether it removed the write-up from Newton's file. (Docket No. 3, Response to ¶ 5.)  However, the testimony cited by Rolling Hills does not actually support this contention.  Moreover, Rolling Hills produced a copy of the write-up in this litigation (*see* Rolling Hills Dep. Ex. 5 (bearing "RHH" Bates stamp)), indicating that it had in fact maintained possession of the document.

deposition, Rolling Hills' corporate deponent testified that Rolling Hills typically entered set schedules for the full-time employees into the time clock system, not *ad hoc* scheduling for the PRNs. The deponent attempted to explain the notations. She stated that the "schedule" deleted by the notation was not the actual staffing schedule, but rather a routine schedule that should not have been entered into the system in the first place because Newton was a PRN. She explained that Dusek "was *probably* reviewing the time clock system on every PRN because we're not supposed to have set schedules in the system." (Rolling Hills Dep. at 110:17-21) (emphasis added.) The deponent also stated that "[t]hat week [Newton] was going to work Tuesday, Thursday, Saturday." (*Id.* at 111:20-22.) The deponent did not know why Dusek made the notations on August 13, 2010, nearly six weeks before October 1, 2010. These two "delete schedule" entries appear to be the only such entries in Newton's Time Card Report.

On September 9, 2010, Rolling Hills was down one nurse on Newton's unit, leaving only three of the usual set of four staff members. As a consequence, Rolling Hills had to rearrange the patient assignments for the remaining staff, one of whom was a licensed practical nurse ("LPN") who was not permitted to handle new admissions under company policy. Newton's Caucasian supervisor, Irwin, distributed an equal number of patients to Newton, the other RN, and the LPN. Newton believed that this distribution was onerous because she (and presumably the other RN) would be required to handle new admissions, adding to their workload but not the LPN's. Newton also believed that she had been assigned more difficult patients than others on her shift. Accordingly, she asked Irwin to reconsider and to assign more patients to the LPN. Irwin refused. Newton then informed her supervisor that she "refused to work under those conditions," believing it to be an "unfair assignment." (Bryant Dep. at 52:23-24, 53:23.)

Irwin reported the issue to CNO Reedy, who convened a meeting with Newton and two additional Caucasian managers to discuss the issue. At this meeting, Reedy asked Newton whether she had threatened to leave her assigned shift and Newton acknowledged that she had. Reedy then asked Newton to leave for the day, which Newton did. There is no evidence in the record that Newton complained about racial discrimination at this meeting.[9]

On an unspecified date in September 2010 – likely before September 24 – Newton alleges that she spoke with Daisy Broughton, an African-American supervisor, who told Newton that Rolling Hills was "trying to get rid of my black nurses" and recommended that Newton "do what you're asked to do and shut up." (Bryant Dep. at 97:17-20, 98:12-15.) Broughton did not say how she formed this belief. Newton did not report Broughton's alleged concerns to Rolling Hills.

On September 23, 2010, Dusek sent an email to all employees soliciting their October availability to the extent not already provided. Newton did not respond to that email.

On the evening of September 24, 2010, Rolling Hills determined that it needed an

---

[9]Although Newton's Response argues that Newton "complained to [Rolling Hills] that she was being given discriminatory work assignments because of her race," (Docket No. 32 at p. 17), the referenced testimony does not support this contention. In that testimony, Newton states that she disagreed with Irwin's patient assignments for that shift, but there is no indication in the record that Newton complained to Irwin that she (Newton) believed that the assignments were racially motivated. In fact, Newton does not even identify the race of the LPN or the other nurse on the shift. Similarly, in her description of the meeting with Reedy and the two other Caucasian supervisors, Newton does not state that she complained about racial discrimination. Although Newton at deposition stated that she subjectively believed Irwin's actions were based on race, Newton does not state that she raised this concern to anyone at Rolling Hills. Thus, the testimony at most establishes that Newton had a subjective belief that Irwin discriminated against her based on race on September 9, but did not communicate this belief to anyone at Rolling Hills. Newton's attempt to re-characterize her testimony in the Response does not create a genuine dispute of material fact on this point.

additional nurse to cover a shift on September 25 and 26 on short notice. Newton informed the staffing coordinator, Dusek, that she (Newton) would cover the shift. (Bryant Dep. at 62:4-6 ("I told her that. . . she could pencil me in.") However, Newton forgot that she had agreed to cover these shifts. She did not show up for work on either day.[10] At some point during the two days in which Newton failed to appear for her assigned shifts, Broughton called Newton and left her a voicemail stating that, "You're supposed to be here, you're not here, wondered if anything happened." (*Id.* at 62:15-18.)[11]

Newton had previously been scheduled to work on September 27. However, Newton alleges that, the night before, the night supervisor confirmed that she had been removed from the September 27 staffing schedule. The staffing schedule for September 27 lists Newton under the Geriatric Unit but contains the notation "moved to Adult." Under the "Adult I" list, a name ending in "a" is blacked out. Newton did not show up for work on September 27.

Newton also alleges that she was removed from the staffing schedule for additional days after September 27, at least including September 30. The schedules for September 28-30 produced by Rolling Hills do not list Newton for any shifts. However, as noted above, an unknown individual made a handwritten note on the September 30 schedule that Bryant and Newton were "not to work anymore." At deposition, the Rolling Hills deponent speculated that, as to Newton, this notation reflected only that Newton had not submitted her October availability,

---

[10]Even though she agreed to cover these shifts, the staffing schedules for September 25 and 26 do not include any references to Newton.

[11]In the Response and in her statement of facts, Newton alleges that, contrary to typical company practice, no one at Rolling Hills called her to ask why she had not reported for her shift. (*See* Docket No. 32 at p. 13; Docket No. 40 ¶ 9.) This assertion plainly contradicts the record, in which Newton stated that Broughton called her to find out why she was not at work.

not that Rolling Hills had decided not to permit her to work anymore. Accordingly, Rolling Hills alleges that Newton has remained on its list of PRNs.

Newton applied for and received unemployment benefits during October and November 2010, before she accepted a new job.[12]

## ANALYSIS

### I. Summary Judgment Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

---

[12]Newton responded "yes" when asked if she had ever been terminated by an employer. (Newton Dep. 25:12-14.) However, when responding to questions concerning the events that occurred in late September, Newton stated that she was "never called back" by Rolling Hills, that she applied for and received unemployment benefits immediately following those events, and that she soon took other employment. Thus, notwithstanding her answer to the general question posed by Rolling Hills at deposition, it appears that Newton believed she was specifically terminated by Rolling Hills in late September 2010.

But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## II.     Applicable Law[13]

(1)     Disparate Treatment

A plaintiff may prove a disparate treatment claim either by introducing direct evidence of discrimination or by proving circumstantial evidence that would support an inference of discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).

Direct evidence of discriminatory intent is "evidence which, if believed, . . . proves the existence of a fact *without requiring any inference*." *Ross v. Pfizer, Inc.*, 375 Fed. App'x 450, 453 (6th Cir. 2010) (internal quotation omitted) (emphasis added); *see also DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.") (internal quotations omitted). Thus, "the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *DiCarlo*, 358 F.3d at 415 (quoting *Hein v. All Am. Plywood Co.*, 232 F.3d 482,

---

[13]Although the plaintiffs have asserted claims under Title VII, § 1981, and the THRA, the court need only conduct a single analysis. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (noting that § 1981 claims are reviewed "under the same standards as claims of race discrimination brought under Title VII"); Tenn Code Ann. 4-21-411 (2011) (providing that all THRA claims filed after June 20, 2011 shall be governed by the *McDonnell-Douglas* burden-shifting framework).

488 (6th Cir. 2000)).  "A facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  If the plaintiff presents direct evidence that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have taken the adverse action, even if it had not been motivated by impermissible discrimination.  *Id.*

Under the circumstantial evidence approach, the familiar *McDonnell Douglas* burden-shifting framework is employed.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007).  First, the plaintiff must produce evidence to establish a *prima facie* claim.  *Caterpillar*, 496 F.3d at 593.  To establish a *prima facie* case of racial discrimination, the plaintiff must demonstrate that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) a person outside of her protected class replaced her or she was treated differently than similarly situated members of the unprotected class.  *Id.*

If the plaintiff makes out her *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision."  *Clay v. United Parcel Serv.*, 501 F.3d 695, 703-704 (6th Cir. 2007); *Carter v. Univ. of Toledo*, 349 F.3d 269, 273-74 (6th Cir. 2003).  To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision.  *Clay*, 501 F.3d at 703-704.

Finally, if the defendant meets its burden of articulation, "the burden shifts back to the

plaintiff to show that the reason put forth by the defendant is pretextual, which can be done by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.*; *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  To make this showing, "the plaintiff must allege more than a dispute over the facts on which [her] discharge was based.  [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).  In order to determine whether the defendant had an "honest belief" in the proffered basis for the adverse employment action, the court must look to whether the employer can establish a reasonable reliance on the particularized facts that were before it at the time the decision was made.  *Id.* at 494.  The court must apply the following standard:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.

*Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)) (emphasis added); *Majewski v. Automatic Data Processing*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for [the adverse employment action], the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect").  A plaintiff who simply relies on *ipse dixit* testimony that the proferred reasons were not the motivating factors behind the termination decision has not met her burden.  *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 Fed. App'x 266, 274 (6th Cir. 2006)

(upholding district court grant of summary judgment where plaintiff "baldly assert[ed]" that employer's proferred reasons for termination were pretextual by reference only to the plaintiff's self-serving deposition testimony and affidavits).

In conducting this analysis, "[c]ourts are not intended to act as super personnel departments to second guess an employer's facially legitimate business decisions." *Adams,* 179 Fed. App'x at 272. Thus, "[t]he pivotal issue in a Title VII claim of discriminatory employment practices is whether 'the employer treated some people less favorably than others because of their race,' not whether the employer treated an employee less favorably than 'someone's general standard of equitable treatment.'" *Id.* (quoting *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 2006)).

(2)    Retaliation

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C.§ 2000e-3(a) (2011); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Claims of retaliation also proceed under the *McDonnell Douglas* burden-shifting framework. *Imwalle*, 515 F.3d. at 543.

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) the employee has engaged in Title VII-protected activity; (2) the employer had knowledge of this fact; (3) the employee suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Imwalle*, 515 F.3d at 544. This a

burden "easily met." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

Once the plaintiff has established her *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employer's [actions]." *Imwalle*, 515 F.3d at 544; *Singfield*, 389 F.3d at 563.

If the defendant satisfies this burden, the plaintiff must than demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation for engaging in the protected activity. *Id.* As with discrimination claims, a plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Id.* at 564. At this stage, "[i]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *Imwalle,* 515 F.3d at 544-45. Thus, the Sixth Circuit "has held that a plaintiff's *prima facie* case, combined with disbelief of the defendant's proffered reasons for the negative employment action, permits a finding of retaliation by the factfinder." *Imwalle*, 515 F.3d at 544.

The Sixth Circuit has observed that ascertaining the true reason for an employer's actions in the retaliation context often presents "an elusive factual question." *Singfield*, 389 F.3d at 564. Thus, "caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence." *Id.* (holding that, "though [the plaintiff] may fail at trial to establish his Title VII retaliation claim under the preponderance of the evidence standard, the district court erred in dismissing the Title

VII retaliation claim at this stage.")

### III.   **Direct Evidence of Disparate Treatment**

Newton and Bryant contend that they have presented direct evidence of disparate treatment.  They argue that Broughton's September 2010 statement to Newton that Rolling Hills was seeking to "get rid of my black nurses" provides direct evidence that race was a motivating factor in Rolling Hills' decisions affecting them, given that Rolling Hills allegedly refused to schedule them for any shifts beginning that month.

Even if it were true that Broughton made the alleged statement to Newton, Broughton did not provide any details to Newton concerning why she made this statement or how she formed this belief.   Thus, to connect her statement to adverse actions against the Plaintiffs, the jury would need to infer that Broughton observed a corporate decision-maker at Rolling Hills make a statement or commit an act that led her to believe that Rolling Hills intended to eliminate its black nurses and that Rolling Hills acted on the alleged intent with respect to the Plaintiffs. Because Broughton's statement requires inferences to support a conclusion that Rolling Hills acted against the Plaintiffs on the basis of race, it does not constitute direct evidence.  *See Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 433 (6th Cir. 2002) (finding that sworn testimony from plaintiff's managers that race played motivating factor in failure to promote plaintiff did not constitute direct evidence because manager was not involved in decision-making process and manager "did not reveal the basis for his opinion"); *compare DiCarlo*, 358 F.3d at 416 (comment by plaintiff's manager that there were "too many dirty wops" at the company constituted direct evidence of discrimination against terminated Italian-American employee, because manager, after making those comments, recommended that plaintiff be terminated and engaged in "thorough

discussions" with his own superior who adopted that recommendation).

**IV.**     **Bryant's Remaining Discrimination and Retaliation Claims**

     A.     <u>Circumstantial Evidence of Disparate Treatment</u>

Rolling Hills contends that it is entitled to summary judgment on Bryant's circumstantial discrimination claims because Bryant (1) was not subject to any adverse employment actions, (2) has presented no proof that she was treated differently than similarly situated non-minority employees, and (3) cannot prove pretext.

     (1)     <u>Adverse Employment Actions</u>

Bryant contends that she was subject to the following two adverse employment actions: (1) she was removed from the staffing schedule for a ten-week period in mid-2010; and (2) Rolling Hills terminated her in September 2010 and/or refused to schedule her for any shifts from that point forward.

In the context of a discrimination claim, an "adverse employment action" "requires a materially adverse change in the terms and conditions of employment." *Watson v. City of Cleveland*, 202 Fed. App'x 844, 854 (6th Cir. 2006). The adverse change "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities'"; it may include, for example, "'termination of employment, a demotion evidenced by a decrease in wage or salary, . . . a material loss of benefits, . . . or other indices that might be unique to a particular situation.'" *Id.* (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).

With respect to the 10-week shift elimination, Rolling Hills repeatedly contends that Bryant's claims must fail because Bryant was factually mistaken when, at deposition, she claimed that Rolling Hills did not schedule her for any shifts in March and April 2010. (*See, e.g.*, Docket

No. 21 at p. 11.)  Although Rolling Hills is correct that Bryant actually worked several shifts in March and the first three weeks of April, Rolling Hills articulates and relies on an incomplete set of the relevant facts.  At her deposition, Bryant went on to state that she was not scheduled for any shifts in *May* and *June*, as well.  Rolling Hills does not dispute that Bryant was not scheduled for a single shift between April 20 and July 7, during which time Bryant contends that she was prepared to return to work and contacted Rolling Hills about why she had not been scheduled. Thus, although Bryant was mistaken that she did not work a single shift in March and April, she was correct that Rolling Hills did not schedule her for any shifts between late April and early July.  Thus, Rolling Hills' refusal to schedule Bryant for any shifts for that ten-week period, which necessarily reduced Bryant's wages from employment at Rolling Hills to zero, constituted an adverse employment action.[14]

 With respect to the events that transpired in September 2010, the parties vigorously dispute whether Rolling Hills removed Bryant from the schedule, refused to schedule Bryant going forward, and/or terminated her.  Bryant alleges that she was removed from the schedule, that she sent an email to Ballard about the schedule that was not returned, that one of her supervisors informed her that Reedy would decide whether she could return to work, and that Reedy never responded to Bryant's voicemail regarding forthcoming scheduling.  Rolling Hills essentially contends that it took no actions at all with respect to Bryant.  By its account, Bryant

---

[14]The fact that, soon after she determined that Rolling Hills was not scheduling her for any shifts, Bryant sought and obtained a nursing position at Skyline does not affect this analysis. Aside from pointing out that Bryant took this other position and questioning whether she in fact was available to work at Rolling Hills in May or June (in addition to her responsibilities at Skyline), Rolling Hills has not asserted that Bryant's obtaining alternative employment played any role in the initial decision not to schedule Bryant for any shifts as of April 20.

simply failed to report for any scheduled shifts after September 13, told Rolling Hills that she quit on September 17, and never submitted her availability for October or any subsequent month. Rolling Hills relies in large part on its interpretation of certain notations ("Marilyn quit" and Bryant was "not to work anymore") in the daily staffing schedule, but the authors of those notations are unknown, and the record contains no testimony from those unknown authors concerning the meaning of the notations and/or the basis for them.

Taking the evidence in the light most favorable to Bryant, the jury could find that Rolling Hills made a decision not to permit Bryant to return to work after mid-September 2010 and/or that Rolling Hills terminated Bryant effective September 30, 2010. It could also find that, having made several fruitless attempts to contact Rolling Hills concerning future shifts, it was reasonable for Bryant to not have responded to the September 23, 2010 from Dusek. The parties' competing factual contentions create disputed issues of material fact concerning whether Rolling Hills engaged in an adverse action against Bryant in September 2010. Whether Rolling Hills in fact decided to remove Bryant from the schedule in September 2010, decided to refuse to schedule her going forward, and/or decided to terminate her will be issues of fact for the jury to decide based on its assessment of the evidence, including credibility determinations.

(2)     Comparator Analysis

To make out her *prima facie* case, Bryant must show that a comparable non-protected person was treated better than she was for engaging in the same conduct. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). To make this showing, Bryant must produce evidence which, at a minimum, establishes that, for the same or similar conduct, she was treated differently than similarly situated non-minority employees. *Id.*

With respect to the mid-2010 scheduling cut, Rolling Hills contends that "[t]here is no evidence that Bryant was removed from the schedule in March and April 2010 and again after September 15, 2010, and she has not alleged and cannot show that she was replaced by someone outside her protected category." (Docket No. 21 at p. 14.) Rolling Hills argues that, "for that reason alone, summary judgment in favor of Rolling Hills is required." (*Id.*) Rolling Hills' stated legal position is in error. In lieu of showing that she was replaced by a non-minority employee, Bryant can meet her *prima facie* burden by demonstrating that she was treated differently than similarly situated non-minority employees. *See Caterpillar*, 496 F.3d at 593. Furthermore, as the court has found, Bryant was subjected to an adverse employment action in mid-2010, and there is at least a question of fact as to whether she was subjected to an adverse action in September 2010. There is no evidence in the record that Rolling Hills declined to schedule any of its Caucasian nurses for shifts in May and June 2010, nor is there evidence that Rolling Hills refused to schedule any Caucasian nurses for shifts after mid-September 2010, even where the nurse made repeated attempts to be placed on the schedule. Thus, particularly where Rolling Hills' counter-argument is legally and factually unfounded, Bryant has satisfied her *prima facie* burden as to both adverse actions.

(3)     Legitimate Non-Discriminatory Reasons/Pretext

With respect to the ten-week shift elimination, Rolling Hills alleged at deposition that it did not schedule Bryant because it was undergoing a management transition, during which no shifts were available for Bryant to work. In its motion, Rolling Hills also points out that, as a PRN, Bryant was not guaranteed any hours and took a position at Skyline on April 26, 2010, although Rolling Hills does not identify any record evidence indicating that Bryant's employment

at Skyline impacted its decision not to schedule her. The court interprets Rolling Hills to be contending that, because of a management transition, availability for shifts was limited, no shifts were available for Bryant to fill during this period, and Rolling Hills was under no obligation to provide Bryant shifts to work. Although it is not self-evident how or why the change to the company's CEO and CNO impacted the number of shifts available for Bryant to work, this position satisfies Rolling Hills' low burden of production.

In response, Bryant contends that this proffered reason was merely a pretext for discrimination. Bryant points out that, during the time frame in which she was not scheduled for a single shift, the hospital continued to engage in normal operations, nurses in her position continued to receive regular work, and there is no evidence that any Caucasian nurses were similarly denied the opportunity to work a single shift. Moreover, according to Bryant's testimony, Klinikowski had in the past engaged in potentially discriminatory actions towards Bryant and other African-American nurses, including an unjustified verbal reprimand of Bryant in February 2010, just after Bryant had returned to work from her leave. Two months later, Rolling Hills – through schedules approved by Klinikowski – ceased scheduling Bryant for any shifts, and Bryant's supervisors refused to return her calls seeking to determine why. Klinikowski then resigned, apparently at the new CEO's behest, after which Reedy called Bryant to announce that it was a "new day" at Rolling Hills. The jury could interpret this evidence as discrediting Rolling Hills' proffered reason that normal business needs during a "transition period" justified its failure to schedule Bryant for a shift, a justification that it did not communicate to Bryant at the time.

Bryant has produced sufficient evidence from which the jury reasonably could find that

Rolling Hills did not "honestly believe" that there was not even a single shift available for Bryant to work between April 20 and July 7. Furthermore, the jury could find that, at least under Klinikowski's stewardship, race played a motivating factor in the decision not to schedule Bryant for any shifts. Thus, Bryant has provided more than mere speculation that race, rather than normal business needs, played a motivating factor in Rolling Hills' decision not to schedule her for a shift for ten weeks.

As to the September 2010 refusal to schedule Bryant for additional shifts, Rolling Hills contends that Bryant simply failed to appear for late September shifts and failed to provide her availability for October, despite multiple attempts by Rolling Hills to solicit that information. These facially reasonable non-discriminatory reasons satisfy Rolling Hills' burden of production.

In response, Bryant contends that these stated reasons are pretextual. First of all, as noted above, she offers a very different account of the events that transpired in September 2010, contending that Rolling Hills ignored and/or rebuffed her entreaties to multiple supervisors to return to work. Second, she points out that Rolling Hills has taken several potentially inconsistent positions regarding her employment status and the events that transpired in September 2010. For instance, although Rolling Hills alleges that Bryant "quit" on September 17, 2010, it continued to fault her for failing to work several shifts after that date and purports to continue to regard her as an employee. Similarly, if Wilson told Bryant on September 15 to speak with Reedy on September 20 about whether Bryant could return to work, it would have been disingenuous for Rolling Hills to expect Bryant to appear for her previously scheduled shifts on September 17 and 19. Similarly, if Reedy refused to return Bryant's September 20 voicemail seeking to determine whether Bryant could return to work, Rolling Hills should not have faulted

Bryant for not appearing for the September 22 and 23 shifts. Furthermore, on September 30, someone at Rolling Hills noted that Bryant was "not to work anymore," which plausibly suggests that Rolling Hills had decided not to permit her to work at Rolling Hills again, regardless of her availability.[15] Finally, Broughton expressed to Newton that Rolling Hills was attempting to "get rid of" African-American nurses. If that statement were taken as true, it could provide additional circumstantial evidence of Rolling's Hills discriminatory intent.[16] Based on this evidence, the jury could find that Bryant did not appear for the late September shifts because Rolling Hills dissuaded her from doing so and that Rolling Hills chose not to permit Bryant to work again after that point. The parties' competing accounts, which turn on the credibility of Bryant's version of events and competing interpretations of certain notations made by unknown authors for unknown reasons, are for the jury to resolve.

Accordingly, Bryant's racial discrimination claims related to the ten-week shift elimination and the September 2010 events will remain for trial.

**B.** **Bryant's Claims for Retaliation**

(1) *Prima Facie* Case

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) the employee has engaged in Title VII-protected activity; (2) the employer had knowledge of this fact; (3) the employee suffered an adverse employment action; and (4) there is a causal connection between

---

[15]The court also notes that it is unclear why Bryant was never administratively terminated from Rolling' Hills rolls, either in October 2010 – just after Bryant allegedly "quit" and was "not to work anymore" – or in October 2011.

[16]Rolling Hills has not contended in its briefing or the supporting materials that the statement of Broughton, who was a supervisor, is inadmissible. Accordingly, for purposes of ruling on this motion, the court assumes, without deciding, that the statement constitutes admissible hearsay.

the protected activity and the adverse employment action. *Id.*

Bryant alleges that she engaged in protected activity when she (1) participated in the EEOC/THRC's investigation of Norman's race discrimination complaints in December 2009; (2) called the corporate hotline to complain about racial discrimination in December 2009; (3) complained to Reedy in November 2009 that Caucasian nurses continued to resist her taking any position of authority over them; and (4) reported a co-worker's racially offensive comments to management in August 2010. Rolling Hills does not dispute that these actions, if true, constitute "protected activity" under Title VII. Indeed, participation in an EEOC (or THRC) proceeding is expressly protected by Title VII, *see* 42 U.S.C. § 2000e-3(a) (2011), and, as to the remaining complaints, as long as an employee has a good faith belief that a particular employment practice is unlawful and the manner of opposition to that practice is reasonable, the activity falls within the ambit of "protected activity" under Title VII. *Johnson*, 215 F.3d at 579-80.

As to the second element, the decisionmaker's knowledge of the protected activity is an essential element of a *prima facie* case of unlawful retaliation. *Frazier v. USF Holland, Inc.*, 250 Fed. App'x 142, 148 (6th Cir. 2007) (finding that plaintiff failed to establish *prima facie* case where evidence did not reflect that employer was aware of prior discrimination charge). Rolling Hills contends that Bryant's claims must fail because she has not shown that Rolling Hills was aware that Bryant had participated in the THRC investigation related to Norman. The court agrees that Bryant has failed to produce evidence that Rolling Hills was aware of her December 2009 role in the THRC investigation and, therefore, may not claim at trial that it served as the predicate for retaliation. That is not the end of the court's inquiry, however. Rolling Hills does not deny that it was aware that Bryant attempted to report racial discrimination through a

corporate hotline in December 2009 or that Bryant complained to Reedy in August 2010 about a co-worker's racially charged comments. As to the November 2009 meeting with Reedy, Bryant contends that she complained to Reedy about racial discrimination in that meeting, while Rolling Hills (without any testimony from Reedy) claims that Bryant did not, thereby creating a disputed issue of fact for the jury to resolve. Thus, although Bryant may not argue at trial that she was retaliated against because she participated in the THRC investigation, Bryant has met the second element of her *prima facie* case with respect to the other three protected activities, two of which are undisputed and one of which is subject to a genuine dispute of material fact.

As to the third element, that of adverse action, a plaintiff must show that the employer's conduct "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (quotation marks omitted); *accord Caterpillar*, 496 F.3d at 596. The burden of showing an adverse employment action is "less onerous in the retaliation context than in the anti-discrimination context." *Caterpillar*, 496 F.3d at 595-96 (citing *Burlington N.*, 126 S. Ct. at 2415). Thus, the U.S. Supreme Court has found that conduct that may not be actionable under a disparate treatment analysis may constitute an "adverse" action in the context of a retaliation claim. *Caterpillar*, 496 F.3d. at 596 (finding that brief placement on paid administrative leave and issuance of 90-day performance plan met "relatively low bar" for this element); *see also Norman v. Rolling Hills Hosp.*, Case No. 3:10-cv-0500, 2011 WL 1877651 (M.D. Tenn. May 17, 2011) (finding that disciplinary write-up of Rolling Hills employee that did not constitute an "adverse action" for disparate treatment purposes did constitute an "adverse action" for retaliation purposes.); *Crawford v. Carroll*, 529 F.3d 961, 974 n.13 (11th Cir. 2008) ("*Burlington* also

strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions.")

Here, Bryant contends that the following incidents constituted retaliatory "adverse actions": (1) Klinikowski writing up Bryant in February 2010 for failing to report to work in inclement weather despite her knee condition; (2) Rolling Hills floating Bryant among the hospital's units after February 2010, while allegedly not doing the same for Caucasian nurses; (3) Klinikowski verbally reprimanding Bryant in February 2010 in front of co-workers; (4) Klinikowski removing Bryant from the work schedule for ten weeks in mid-2010; (5) supervisors refusing to respond to Bryant's inquiries concerning why she had not been scheduled for any hours in mid-2010; (6) placing Bryant on the Geriatric Unit on September 13, 2010 and refusing to permit Bryant to work other units; (7) cancelling her scheduled shifts in late September 2010 and noting on the daily staffing schedule that she was "not to work anymore"; and (8) refusing to return her calls when she attempted to be placed back on the schedule.

For the reasons already discussed, a reasonable jury could find that the mid-2010 decision not to schedule Bryant for any shifts and the decision not to schedule her for any shifts after September 2010 constitute adverse employment actions. The Klinikowski write-up in February 2010, which appears to have been the only instance in which a Rolling Hills employee ever was cited for violating the inclement weather policy, and the refusals to respond to Bryant's inquiries concerning the schedule in mid-2010 and September 2010 also meet the low bar for adverse actions in the retaliation context. Also, Klinikowski's loud verbal reprimand to Bryant, which may have been unfounded and discriminatory, is sufficient to qualify as a potentially retaliatory

action.  However, floating between hospital units was indisputably a requirement of Bryant's

employment as a PRN, and Bryant admits that she did not receive any written documentation

from her doctor regarding workplace-based medical restrictions.  Thus, "floating" Bryant through

different units and refusing to grant Bryant a transfer request out of the Geriatric Unit on one

particular day – actions plainly encompassed by her employment responsibilities – do not

constitute adverse actions under the circumstances presented here.

 As to the final element, "a plaintiff must produce sufficient evidence from which an

inference could be drawn that the adverse action would not have been taken in the absence of the

protected conduct.'"  *Lamer v. Metaldyne Co. LLC*, 240 F.3d. App'x 22, 29 (6th Cir. 2007)

(quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)).  Whether an

adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to

causation.  *Singfield*, 389 F.3d at 563 (inferring causation when employee was fired three months

after engaging in protected activity); *Howington v. Quality Rest. Concepts, LLC*, 298 Fed. App'x

436, 446 (6th Cir. 2008) ("When an employee is disciplined in close proximity to his or her

protected activity, such proximity provides highly probative evidence of a causal connection

between the adverse employment action and the protected activity.") (internal quotation marks

omitted).  Causation can also be inferred if an employee faces higher disciplinary scrutiny than

similarly situated employees, *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364-65 (6th Cir.

2001), or if the employee faced higher scrutiny than she faced before engaging in the protected

activity.  *Cantrell v. Nissan N. Am. Inc.*, 145 Fed. App'x 99, 106 (6th Cir. 2005); *Lamer*, 240

Fed. App'x at 32-33.

 Here, there is a sufficient temporal nexus, combined with other indicia of potentially

discriminatory intent, to establish a causal nexus between the protected activity and the allegedly retaliatory conduct. In November and December 2009, Bryant complained to Rolling Hills' corporate office and to Reedy about racially discriminatory treatment. On February 15, 2010, just five days after returning from leave – *i.e.*, the first time she had appeared at work since complaining about racial discrimination – Klinikowski cited Bryant for violating the inclement weather policy, without mentioning that Bryant had called in or that Bryant had explained she feared re-injuring her knee in transit to work. Bryant contends that this write-up, although technically correct, was unfair and not done for Caucasian employees under similar circumstances. Furthermore, it appears that Bryant was the first and only Rolling Hills employee ever to be cited for violating the inclement weather policy. That same month, Klinikowski also loudly reprimanded Bryant in front of her co-workers, perhaps in an attempt to humiliate her. Two months later, Rolling Hills ceased scheduling Bryant for any shifts, even while the hospital continued to operate. Soon thereafter, Klinikowski resigned at Rolling Hills' behest, after which Reedy called Bryant to announce that it was a "new day" at Rolling Hills, suggesting that perhaps Bryant in fact had been unfairly treated in the past.

The court finds that the series of adverse actions, which began just two or three months after Bryant complained about racial discrimination at Rolling Hills, combined with other indicia of discriminatory treatment, demonstrate the requisite causal connection between the protected activity and the mid-2010 layoff. *See Imwalle*, 515 F.3d at 550 (finding that three-month period between protected activity and termination supported an inference of a causal connection); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) ("[A]t the *prima facie* stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal

connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible."); *but cf. Frazier*, 250 Fed. App'x 142 (finding that causal connection was not established, where seven years elapsed between protected activity and plaintiff's termination, plaintiff produced no other indicia of retaliatory conduct, and plaintiff relied on self-serving speculation that there was "no logical explanation" for her termination other than discrimination).

Similarly, shortly after complaining to Reedy in August 2010 about racially discriminatory comments by a co-worker, Rolling Hills refused to address Bryant's repeated requests concerning upcoming scheduling and did not schedule her for any shifts after September 2010. Moreover, as noted above, Rolling Hills has taken potentially inconsistent positions regarding Bryant's employment status, and Bryant has produced evidence that discredits the reasons proffered by Rolling Hills for its conduct, including a statement by an African-American supervisor that Rolling Hills was seeking to eliminate African-American nurses. Furthermore, the conduct that occurred in September 2010 could also be interpreted as part of a pattern of retaliatory conduct that began in February 2010, when Bryant returned to work after complaining about racial discrimination at Rolling Hills. Thus, based on the close proximity between the August 2010 complaint and the alleged retaliatory actions in September 2010, combined with the previous pattern of potentially retaliatory conduct and other indicia of potentially discriminatory intent, Bryant has established the requisite causal connection here as well.

(2)      Legitimate Non-Discriminatory Reason/Pretext

In response, Rolling Hills contends that it did not subject Bryant to any discriminatory treatment. It alleges that Klinikowski wrote up Bryant for a facial violation of the inclement

weather policy, that Bryant was never removed from the schedule in mid-2010, and that Bryant was not scheduled for additional shifts in September 2010 because she failed to submit her hours as required. It disputes that Bryant contacted management to be placed back on the schedule. Also, although Rolling Hills' position regarding the mid-2010 reduction in hours appears to be factually incorrect (*see infra* at p. 22-23), Rolling Hills testified that it refused to schedule Bryant for any shifts because of a management transition period. With that understanding, the court finds that Rolling Hills has met its burden to articulate legitimate, non-discriminatory reasons for its actions.

In response, Bryant refers back to the evidence establishing the causal element of her *prima facie* case. Evidence concerning the causation element of a plaintiff's *prima facie* case of retaliation is relevant to – and may satisfy – the plaintiff' s burden to show pretext if it can discredit the defendant's proffered justifications. *Reeves*, 530 U.S. at 147 ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); *Imwalle*, 515 F. 3d 531, 544 (6th Cir. 2008) (applying *Reeves* standard to retaliation claim). Taking the evidence in the light most favorable to Bryant, a reasonable jury could find that Rolling Hills' proffered non-discriminatory reasons do not explain its decisions. Furthermore, because Bryant has adduced evidence that other employees were not subject to the same treatment and that Rolling Hills may have targeted African-Americans for discriminatory treatment, the jury could find that retaliation was a motivating factor behind Rolling Hills' actions. Thus, the question of retaliation will remain for trial. *Imwalle*, 515 F.3d at 551 (upholding denial of motion for judgment as a matter of law on plaintiff's retaliation claim,

because, "[a]lthough we find the question to be a close one, . . . the totality of the evidence, when viewed in the light most favorable to [the plaintiff], does not lead reasonable minds to but one conclusion in favor of [the employer]."

## IV. Newton's Disparate Treatment and Retaliation Claims

### (A) Disparate Treatment

Rolling Hills contends that Newton's *prima facie* case fails because (1) it never took an adverse employment action against her; and (2) Newton has not shown that she was treated differently than similarly situated employees.

### (1) Adverse Employment Action

Newton alleges that she suffered an adverse employment action when Rolling Hills allegedly discharged her and/or refused to schedule her for any shifts after September 2010.[17] Rolling Hills disputes that it ever removed Newton from the schedule or terminated her. As with Bryant's case, the dispute essentially involves the resolution of competing factual accounts and the interpretation of certain business records susceptible to multiple interpretations.

Newton contends that she was removed from the staffing schedule on September 27 and thereafter. The record contains evidence that could interpreted as supporting this contention,

---

[17]Rolling Hills' initial brief addressed certain other actions by Rolling Hills that Newton, at deposition, had identified as racially discriminatory, including the March 2010 counseling concerning the wire notebook and the failure to grant Newton a shift transfer out of the Adult I Unit. The "Adverse actions" section of Newton's response brief only addresses the alleged termination, although Newton alleges in a separate section that the counseling and the transfer denial reflected disparate treatment. Accordingly, the court finds that Newton does not dispute that the counseling and transfer denial were not independently actionable, but also seeks to show that these actions reflect circumstantial evidence of discriminatory intent. The court would have found that the counseling and denial of transfer requests, neither of which impacted Newton's pay, benefits, or employment status, were not adverse employment actions in any case. *See Kocsis*, 97 F.3d at 885; *Hill v. Nicholson*, 383 Fed. App'x 503, 509 (6th Cir. 2010).

including the confirmation by a night supervisor that Newton had been removed from the September 27 schedule, the blacked-out name ending in "a" (which may have been "Deanna") on the September 27 schedule, the notations from Dusek on the Time Entry Report that some form of schedule related to Bryant was deleted with respect to September 27 and October 1, respectively, the September 30 staffing schedule notation that Newton was "not to work anymore," and the fact that Newton applied for and received unemployment benefits effective October 2010. Based on this evidence, a reasonable jury could find that Newton was subject to an adverse action in September 2010.

(2)      Comparator Analysis

Newton must show that a similarly situated non-protected employee was treated differently than she with respect to the alleged refusal to schedule her for any shifts after September 26. Newton alleges that she was removed from the schedule because she failed to show up for her shifts on September 24 and 25, contending that a similarly situated Caucasian employee was not removed from the schedule under similar circumstances.

The Sixth Circuit has articulated the standard for this analysis as follows:

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated *in all respects*. Thus, to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it.

*Mitchell*, 964 F.2d at 583 (emphasis in original) (internal citations omitted); *accord Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002). Thus, a plaintiff is "required to prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of the

[comparator's]." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The plaintiff and the comparator must have engaged in acts of "comparable seriousness." *Clayton* 281 F.3d at 611.

Here, Newton alleges that a white employee, John Jay, was not disciplined for a "no show." Newton claims that Jay called her on September 27, 2010 – the date when Newton allegedly was removed from the schedule – to express to Newton that, at some unspecified time, he had not been disciplined when he failed to appear for a shift. Newton provides no other details concerning the alleged similarity between her circumstances and those of Jay, aside from her contention that she and Jay did "the exact same thing." (Docket No. 32 at p. 13.)

Newton has failed to meet her evidentiary burden for at least two reasons. First, the statement from Jay is plainly inadmissible hearsay. Newton relies on the unsworn statement from Jay, who was not a supervisory employee, for the truth of what Jay asserted. Thus, this evidence is barred by the hearsay rule and may not be considered on summary judgment. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999); *see also Dickens v. Interstate Brands Corp.*, 384 Fed. App'x 465, 468-471 (6th Cir. 2010) (finding that comparator element was not met where evidence regarding alleged comparator constituted unsworn hearsay from co-worker that was barred from consideration on summary judgment). Second, even if the jury were permitted to consider Newton's recollection of Jay's statement, Newton has not produced evidence demonstrating that Jay was similarly situated to her in all relevant respects. Newton admits that, on the night of September 24, she spoke with her scheduler and agreed to cover a shift for a co-worker who was unavailable that weekend on short notice. The shift was scheduled to begin at 7 A.M. the next day. Newton admits that she forgot

38

about the shift and failed to show up for work.  Certainly, the fact that Newton agreed –
apparently on less than 12 hours' notice – to cover two shifts in an apparent emergency and then
failed to show up for work are relevant aspects of her employment situation that weekend.
Newton has not produced any evidence concerning the circumstances of Jay's alleged no-show,
let alone whether those circumstances were similar to Newton's particularly egregious failure to
appear for work.  *See Clayton*, 281 F.3d at 611 ("The employer's more severe treatment of more
egregious circumstances cannot give rise to an inference of discrimination.").  Therefore, Newton
has not made out a *prima facie* case of discrimination.

      (B)    <u>Retaliation</u>

          (1)    *Prima Facie* Case

      Newton contends that she engaged in "protected activity" on two occasions: (1) when she
complained to Starnes in March 2010 about a racially discriminatory counseling and (2) when
she allegedly complained to Rolling Hills on September 9, 2010 that she was being given
discriminatory work assignments.  The complaint to Starnes in March 2010 constituted protected
activity because Newton claims that, at that meeting, she asserted to Starnes that Klinikowski's
actions were racially discriminatory and that Starnes investigated these claims.  Although Rolling
Hills disputes that Newton complained about race at this meeting, the record contains no
testimony from Starnes and, therefore, it will ultimately be for the jury to decide whether to
believe Newton's recollection of what she told Starnes.[18]  However, as described *supra* in FN 9,
Newton has not produced evidence that she in fact complained about racial discrimination to

---

[18]The court also finds that Newton's complaint to Starnes satisfies the second element of
Newton's *prima facie* case.

Rolling Hills on September 9, 2010. Accordingly, the court finds that Newton did not engage in protected activity on that date.

Newton believes that Rolling Hills engaged in the following "adverse actions": (1) reprimanding her twice after Caucasian co-workers made false reports about her;[19] (2) sending her home immediately after she complained about an "unfair" work assignment on September 9, 2010; (3) assigning easier tasks and patients to Caucasian nurses; (4) refusing to allow Newton to work on the Adult II unit when it allowed Caucasian employees to do so; (5) disciplining her in February 2010 based on a false accusation by a co-worker without conducting an investigation; (6) failing to remove the unjustified written counseling when it promised to do so; (7) cancelling her shifts from late September 2010 forward; and (8) effectively terminating her by noting that she was "not to work anymore."

Because Newton complained to Starnes in late March 2010, only actions that took place after that date could have been retaliatory. Therefore, the February 2010 counseling by Klinikowski and the unidentified second incident for which Newton has identified no time frame cannot qualify as adverse retaliatory actions. On the merits, Rolling Hills' failure to remove the unjustified disciplinary writeup from Newton's employment file, its decision to send Newton home for the day on September 9, 2010 (which cost Newton pay), and its failure to schedule Newton for any shifts from late September 2010 forward may have been retaliatory adverse actions. However, the remainder of the actions identified by Newton were not adverse. Although Newton speculates that African-American employees were assigned the "most

---

[19]One of these alleged reprimands may be the February 2010 incident involving Kyle and Klinikowski, although Newton's brief does not specify the alleged nature and timing of the two referenced incidents.

difficult" tasks and patients and were refused shift transfers out of the Geriatric Unit, she provides insufficient detail concerning what the difficult tasks were, why certain patients were more difficult than others, and how her assignment purportedly differed from those assigned to Caucasian nurses. Moreover, as a PRN, Newton was required to work in the department specified by Rolling Hills as needed and Rolling Hills informed Newton that it was keeping her on the Adult I Unit because of her extensive experience. Thus, there is no reasonable basis on which the jury could find that the refusal to transfer Newton out of the Geriatric Unit was "adverse."

Newton has established the requisite causal connection between her protected activity and the alleged retaliatory actions. Despite promising to expunge the admittedly unjustified counseling from its records, Rolling Hills did not do so. Particularly where the write-up indicated that "further infractions may result in progressive discipline action to include termination," the jury could interpret Rolling Hills' failure to expunge the write-up as an attempt to provide an unjustified predicate for further disciplinary action against Newton because she had complained about racial discrimination. In September 2010, a supervisor told Newton that Rolling Hills was seeking to eliminate African-American nurses and advised Newton to "shut up and do what you are told." That same month, Newton was sent home after complaining about the conduct of Irwin, a Caucasian nurse. Also, Newton may have been removed from her remaining September shifts as well as the October schedule, perhaps as early as August 13, 2010, for reasons that Rolling Hills has not clearly articulated. Furthermore, the September 27 schedule contains a blacked-out name that may correspond to Newton, and the September 30 schedule contains a notation that Newton was "not to work anymore," suggesting that Newton may not

have been scheduled for additional shifts for reasons other than her purported failure to submit October availability.

The court finds that the temporal proximity between the March 2010 complaint to Starnes and the alleged retaliatory conduct, combined with the Broughton statement and the other evidence undermining Rolling Hills' asserted reasons for failing to schedule Newton, are sufficient to establish the requisite causal connection. Therefore, Newton has satisfied her *prima facie* burden to demonstrate retaliation by Rolling Hills in response to her March 2010 complaint to Starnes.

(2)    <u>Legitimate Non-Discriminatory Reason/Pretext</u>

In response, Rolling Hills contends that it sent Newton home on September 9 because she had threatened to leave a scheduled shift, that Newton did not appear for work on September 27, even though she was scheduled to appear, and that it did not schedule Newton for shifts in October simply because Newton did not submit her availability. This satisfies Rolling Hills' burden of production.

In rebuttal, Newton refers back to the evidence supporting her causal theory. Bearing in mind that pretext often presents a close disputed factual question, the court finds that Newton has adduced evidence that Rolling Hills' non-discriminatory justifications for its actions may have been pretextual, particularly regarding the circumstances under which Newton ceased working at Rolling Hills. Evidence suggests that Rolling Hills may in fact have been targeting African-American nurses who did not, in Broughton's words, "shut up and do what you are told." Furthermore, Rolling Hills' positions concerning the circumstances under which it deleted Newton from the time-keeping system, potentially removed her from the September 27 daily

staffing schedule, and caused someone to declare on the staffing schedule that she was "not to work anymore" appear to be based on supposition or inference rather than determinate fact.  At a minimum, the documents and associated notations raise legitimate questions about whether and why Rolling Hills took certain actions, for which Rolling Hills has not articulated explanations with supporting evidence that require a decision in its favor.  Resolution of the true motivation for Rolling Hills' actions requires the jury to determine which side is providing a more credible account of events and to determine the meaning of certain business records (and associated notations) that are susceptible to multiple interpretations.  These are determinations appropriately reserved for the jury.  *Reeves*, 530 U.S. at 147-48; *Imwalle*, 515 F.3d at 551.

## **CONCLUSION**

For the reasons stated herein, the motion for summary judgment as to plaintiff Bryant will be **DENIED** and the motion for summary judgment as plaintiff Newton will be **GRANTED IN PART** and **DENIED IN PART**.

_____
ALETA A. TRAUGER
United States District Judge